IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| LARRY GRAY BLAKLEY, SR., ) | |
| ) | |
|       Plaintiff, ) | |
| ) | |
|    v. ) | |
| ) | |
| WESTERN SURETY COMPANY, ) | |
| SERGEANT JOSHUA MABE, ) | |
| individually and in his ) | |
| official capacity, DEPUTY ) | 1:24-cv-183 |
| CODY SMITH, individually and ) | |
| in his official capacity, ) | |
| DEPUTY MONTY G. WOLFE, ) | |
| individually and in his ) | |
| official capacity, SHERIFF ) | |
| JOEY LEMONS, in his official ) | |
| Capacity, CAPTAIN TERRY ) | |
| DALTON, individually and in ) | |
| his official capacity, ) | |
| ) | |
|       Defendants. ) | |
| ) | |
| ******************************* | |
| ) | |
| SERGEANT JOSHUA MABE, ) | |
| individually and in his ) | |
| official capacity, ) | |
| ) | |
|       Counterclaim ) | |
|       Plaintiff, ) | |
| ) | |
|    v. ) | |
| ) | |
| LARRY GRAY BLAKLEY, SR., ) | |
| ) | |
|       Counterclaim ) | |
|       Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Plaintiff filed a Verified Complaint asserting claims for relief against various members of the Stokes County Sherriff's Office ("SCSO") arising from an alleged warrantless search and seizure at his home on the evening of March 4, 2021. (See generally Compl. (Doc. 1).) The SCSO officers who conducted the search and seizure - Sergeant Mabe, Deputy Smith, and Deputy Wolfe - do not seek dismissal of the claims asserted against them in their individual capacities at this stage of the proceedings.

Before this court are motions to dismiss filed by Defendant Joey Lemons, the Sheriff of Stokes County, (Doc. 17), and Defendant Terry Dalton, a Captain in the Stokes County Sherriff's Office, (Doc. 20). These motions are ripe for adjudication and for the reasons stated herein, Sheriff Lemons' motion will be denied, and Captain Dalton's motion will be denied in part and granted in part.

I.    **FACTUAL BACKGROUND**

On a motion to dismiss, a court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." Ray v. Roane, 948 F.3d 222, 226 (4th Cir. 2020) (citation omitted). The facts, taken in the light most favorable to Plaintiff, are as follows.

**A. The Alleged Unconstitutional Search and Seizure on March 4, 2021**

Although Sheriff Lemons and Captain Dalton were not present at Plaintiff's home on the evening of March 4, 2021, those allegations are summarized here in order to understand forthcoming analysis of the issues Defendants Lemons and Dalton raise in their motions.

On the evening of March 4, 2021, around 8:30 p.m., Plaintiff Larry Blakley, Sr. – a 75-year-old "frail, elderly" man with Parkinsons's disease who, at the time, lived alone in Stokes County, North Carolina – was "in his home and drinking a coffee when he heard loud knocks at his door by someone who claimed to be law enforcement." (Compl. (Doc. 1) ¶¶ 62, 63, 66, 80, 88.) Plaintiff opened his door and was met by Sergeant Mabe, Deputy Smith, and Deputy Wolfe. (Id. ¶ 67.)

The officers possessed an arrest warrant for Plaintiff's son, Larry Blakley, Jr., although the warrant specified that Blakley, Jr. lived at a different residence, (id. ¶ 68), almost three miles away, (id. ¶ 73). Further, Blakley, Jr. is more than twenty years younger than his father, has "vastly different physical attributes," and does not share his father's birthdate. (Id. ¶¶ 70–72, 79.) At the time of these events, Plaintiff "had not been in contact with [Blakley, Jr.] since October of 2020." (Id. ¶ 79.)

- 3 -

When Plaintiff opened his door, one of the officers "indicated he was looking for a suspect and asked to come inside. [Plaintiff] said no." (Id. ¶ 82.) Nonetheless, the officers "proceeded to enter [Plaintiff's] home." (Id. ¶ 83.) Plaintiff "produced identification to the deputies, demonstrating that he was not the individual listed on the warrant despite the similar name." (Id. ¶ 84.) Even so, the officers "began to search [Plaintiff's] home" without consent. (Id. ¶ 89.) Then, "without warning, [Officers Mabe, Smith, and Wolfe], or some combination thereof, violently threw [Plaintiff] to the floor." (Id.)

"After throwing [Plaintiff] to the floor, Defendants Mabe, Smith, and Wolfe placed [Plaintiff] in handcuffs. They continued their assault on [Plaintiff], violently stomping on his hand and kicking and punching him along his trunk, in the shins, abdomen, hip, back, and even his forehead." (Id. ¶ 90.) Plaintiff begged them to stop. (Id. ¶ 109.)

The officers then "transported [Plaintiff], still restrained in handcuffs, to the Stokes County Jail." (Id. ¶ 93.) However, they "failed to restrain [Plaintiff] in the police car, leaving him to be thrown around in the back seat of the vehicle." (Id. ¶ 94.) Plaintiff was in pain but received no medical attention. (Id. ¶¶ 95, 96.)

- 4 -

Later that evening, Plaintiff returned home, and "called his daughter, Shannon Goins, to tell her about the incident" and that "he was having trouble breathing." (Id. ¶ 99.) Ms. Goins "called for EMS and they arrived to transport [Plaintiff] to the hospital." (Id. ¶ 100.) At the hospital, Plaintiff "was tachycardic and was provided IV medications for his obvious pain." (Id. ¶ 101.) Additionally, he was diagnosed with "one broken rib and left-sided transverse process factures of the vertebral bodies at L1 and L2 on his spine." (Id. ¶ 102.) The next day, Plaintiff's granddaughter, Amanda Blakley, took photographs of Plaintiff. (Id. ¶ 103.) Those photographs reveal extensive purple bruising on the side of his body and marks on his shins. (See id.)

Since the events of March 4, 2021, Plaintiff has suffered chronic pain and "permanent[] injur[y] both physically and mentally." (Id. ¶¶ 113, 115.) He has been "unable to participate in personal, social, or work activities," no longer lives alone, has felt "frustrated and depressed," and has incurred medical expenses totaling $96,198.70. (Id. ¶¶ 114, 116–17.)

**B.  Sheriff Lemons' Training of Officers**

Plaintiff alleges that Sheriff Lemons "holds final policymaking authority with respect to the use of force by

- 5 -

deputies employed with by SCSO." (Id. ¶ 55.) Plaintiff further alleges:

> Defendant Lemons implemented, maintained, and enforced the customs, practices, policies, or procedures that directed, encouraged, or permitted Defendants Mabe, Smith, and Wolfe to conduct unlawful searches and use excessive force against individuals. Defendant Lemons has a duty to ensure that the deputies working for SCSO are qualified, credentialed, and trained.

> SCSO does not provide deputies with training on execution of warrants, use of force, written policies on use of force, or guidance on what degree of force should be used in different situations.

> Defendant Lemons failed to train deputies on proper procedures for lawful searches/obtaining consent to enter private property, and proper use of force. Defendant Lemons further failed to supervise and/or failed to discipline deputies whose previous unlawful searches/entry onto private property and uses of excessive force implied tacit authorization for such behaviors and created a widespread custom and practice of unlawful entry onto property and use of excessive force within the SCSO.

(Id. ¶¶ 147–149.) This court understands these allegations to allege that (1) the Sheriff of Stokes County has a duty and responsibility to ensure that his deputies are qualified, credentialed, and trained, and (2) the Sheriff of Stokes County does not provide any training or written policies on the use of force. Plaintiff does not explain what "qualified" or "credentialed" mean nor does he allege that the deputies lacked qualifications or credentials.

- 6 -

In North Carolina, the State has undertaken a level of responsibility for the training of sheriffs and deputy sheriffs.

> The offices of sheriff and deputy sheriff are [] of special concern to the public health, safety, welfare and morals of the people of the State. The training and educational needs of such officers therefore require particularized and differential treatment from those of the criminal justice officers certified under Article 1 of Chapter 17C of the General Statutes.

N.C. Gen. Stat. § 17E-1. In furtherance of that policy, the State created the North Carolina Sheriff's Education and Training Standards Commission, see N.C. Gen. Stat. § 17E-3, which has the "power[], dut[y], and responsibilit[y]" to establish, for example, minimum training standards to qualify for entry level employment in temporary status or in a permanent position, see N.C. Gen. Stat. § 17E-4. The North Carolina Sheriff's Education and Training Standards Commission has established regulations which address "Minimum Standards for Justice Officers," see 12 N.C. Admin. Code 10B.0301, "Certification of Personnel," see 12 N.C. Admin. Code 10B.0401, and "Minimum Standards of Training for Deputy Sheriffs," see 12 N.C. Admin. Code 10B.0500.

In light of the state's statutory and regulatory scheme, Plaintiff's allegations are not sufficient to plausibly allege a separate duty or responsibility onto Sheriff Lemons, a publicly elected official, see N.C. Gen. Stat. § 162-1, to train his

- 7 -

deputies. As explained hereafter, this court will allow Plaintiff's "condonation" theory of <u>Monell</u> liability to proceed against Sheriff Lemons. <u>See</u> <u>infra</u> Section III.A.i. However, this theory of liability implicates whether the Sheriff failed to "put a stop to or correct" an ongoing pattern of unconstitutional conduct, <u>see</u> <u>Owens v. Balt. City State's Att'ys Off.,</u> 767 F.3d 379, 402 (4th Cir. 2014), which is an issue separate and apart from Plaintiff's unsupported conclusion that Sheriff Lemons had an underlying duty to train his deputies and failed to provide them with any training. (<u>See</u> Compl. (Doc. 1) ¶¶ 147-149.)

## C. **Sheriff Lemons' and Captain Dalton's Supervision of Officers**

Plaintiff's <u>Monell</u> claim, and several other claims, rely on the conclusory allegation that Sheriff Lemons and Captain Dalton "knew of prior excessive force complaints against Defendants Mabe, Smith, and Wolfe . . . but failed to take any corrective action to ensure the safety of the people of Stokes County, North Carolina." (Compl. (Doc. 1) ¶ 18.) Determining whether this conclusion is plausibly supported requires drawing reasonable inferences from the well-pleaded facts in the complaint.

Namely, Plaintiff alleges that after the incident on March 4, 2021, Ms. Goins and Ms. Blakley contacted Captain Dalton

- 8 -

"about filing a complaint against Defendants Mabe, Smith, and Wolfe." (Id. ¶ 104.) Captain Dalton "told them that he had 'already seen the videos' [and] that there was no need to file a complaint," (id.), which Plaintiff interpreted as "attempts to dissuade [them] from filing a complaint," (id. ¶ 105). Plaintiff, Ms. Goins, and Ms. Blakley then traveled together to the Stokes County Sheriff's Office to speak with Captain Dalton in person about the incident. (Id.)

After arriving at the Stokes County Sheriff's Office, Plaintiff, Ms. Goins, and Ms. Blakley showed Captain Dalton the photographs of Plaintiff's bruises. (Id. ¶ 106.) When Captain Dalton saw the photographs, his "demeanor changed." (Pl.'s Ex. 2, Pl.'s Decl. (Doc. 1-2) ¶ 19.)[1] He requested email copies of the photos, and he informed Plaintiff "that the Sheriff's Office had complaints about Defendants Mabe, Smith and Wolfe for excessive force and that the offices [sic] would feed off one

---

[1] Plaintiff has attached his own affidavit and the affidavits of Shannon Goins and Amanda Blakley to the complaint. It appears to this court that the allegations of the complaint are similar or identical to the matters described in the affidavits with one exception. Amanda Blakley attests that her brother, who "has had interactions with law enforcement, specifically Deputy Mabe," has "complained about Mabe using excessive force" in the past. (Pl.'s Ex. 4, Amanda Blakley Decl.) (Doc. 1-4) ¶ 21.) That fact has been considered by this court.

another when they worked together." (Compl. (Doc. 1) ¶¶ 106, 110.)

These factual allegations present a difficult question as to what may be reasonably inferred about the past actions of Officers Mabe, Smith, and Wolfe as well as the knowledge that Captain Dalton (and relatedly, Sheriff Lemons) possessed of those actions. However, this court finds Plaintiff's allegations sufficient to support the following inferences: (1) there were two or more prior complaints of excessive force lodged against Officers Mabe, Smith, and Wolfe; (2) Captain Dalton, and by extension Sheriff Lemons, were aware of the prior complaints; and (3) there was at least some merit to those prior complaints.[2] In light of these inferences, Plaintiff's allegation that "Defendants Dalton and Lemons knew of prior excessive force complaints against Defendants Mabe, Smith, and Wolfe . . . but failed to take any corrective action to ensure the safety of the people of Stokes County, North Carolina," (Compl. (Doc. 1) ¶

---

[2] Defendant Dalton argues that Plaintiff has not alleged "any facts indicating that any prior complaints had merit." (Def. Dalton's Br. (Doc. 21) at 4.) However, one reasonable inference to draw from Captain Dalton's statement that the officers would "feed off one another when they worked together," (Compl. (Doc. 1) ¶ 110), is that this statement was an admission that the officers were known to be more aggressive when they work together. Discovery will afford Captain Dalton an opportunity to refute or clarify this statement.

18), is plausibly supported by facts alleged. While there may be other reasonable inferences to draw from the allegations regarding Captain Dalton's statements, at this stage, all reasonable inferences must be drawn in favor of Plaintiff. <u>See</u> <u>Ray</u>, 948 F.3d at 226.

Additional facts will be raised and addressed as necessary in the analysis to follow.

## II. <u>PROCEDURAL HISTORY</u>

Plaintiff filed his Verified Complaint on March 4, 2024, (Compl. (Doc. 1)), asserting the following claims for relief.

First, he asserts a 42 U.S.C. § 1983 Fourth Amendment claim against Defendants Mabe, Smith, and Wolfe in their <u>individual</u> capacities alleging that these officers conducted an unreasonable search and seizure, and used excessive force, when they arrested Plaintiff at his home on the evening of March 4, 2021. (<u>Id.</u> ¶¶ 124-34.)

Second, he asserts a § 1983 supervisory liability claim against Defendant Dalton in his <u>individual</u> capacity, (<u>id.</u> ¶ 143), alleging that Captain Dalton failed to properly train, discipline, and supervise Defendants Mabe, Smith, and Wolfe despite knowing that the officers had incurred past complaints of excessive force. (<u>Id.</u> ¶¶ 135-44.)

Third, he asserts a § 1983 Fourth Amendment claim against
Defendant Lemons in his <u>official</u> capacity as Sheriff of the
Stokes County Sheriff's Office ("SCSO"), (<u>id.</u> ¶ 152), which this
court construes as a <u>Monell</u> claim against the SCSO. (<u>Id.</u> ¶¶ 145–
52.)

Fourth, he asserts a § 1983 "failure to intervene" claim
against Defendant Wolfe in his <u>individual</u> capacity, (<u>id.</u> ¶ 158),
alleging that Deputy Wolfe "possessed the power to intervene and
stop the unlawful and brutal actions of Defendants Mabe and
Smith." (<u>Id.</u> ¶¶ 153–59.)

Fifth, he asserts a state law claim for assault and battery
against Defendants Mabe, Smith, and Wolfe in their <u>individual</u>
and <u>official</u> capacities. (<u>Id.</u> ¶¶ 160–68.)

Sixth, he asserts a state law claim for gross negligence
against Defendants Mabe, Smith, Wolfe, and Dalton in their
<u>individual</u> and <u>official</u> capacities. (<u>Id.</u> ¶¶ 169–73.)

Seventh, he asserts a state law claim for intentional
infliction of emotional harm ("IIED") against Defendants Mabe,
Smith, Wolfe, and Dalton in their <u>individual</u> and <u>official</u>
capacities. (<u>Id.</u> ¶¶ 174–78).

Eighth, he asserts a claim against Western Surety Company,
the surety of the SCSO's bond, pursuant to N.C. Gen. Stat. §§
162-8, 58-76-5. (<u>Id.</u> ¶¶ 179–87.)

All Defendants, other than Western Surety Company, filed
motions to dismiss. Defendants Wolfe, Mabe, and Smith filed
identical motions, requesting dismissal of the official capacity
claims asserted against them. (Docs. 22, 27, and 31.) This court
issued an order on March 31, 2025, denying Defendants Wolfe,
Mabe, and Smith's motions without prejudice as moot, after
reconstruing Plaintiff's complaint to make it clear that his
claims against Defendants Wolfe, Mabe, and Smith in their
official capacities are claims against the Sheriff of Stokes
County and, thus, only the Sheriff has standing to respond to
those claims. (See Doc. 45 at 5.)

This memorandum opinion and order addresses the motions to
dismiss filed by Defendant Sheriff Lemons, (Doc. 17), and
Defendant Captain Dalton, (Doc. 20). Sheriff Lemons argues that
Plaintiff's Monell claim (Claim III) should be dismissed
pursuant to Rule 12(b)(6). (See Def. Lemons' Br. (Doc. 18) at 6–
12.)[3] Lemons also argues that Plaintiff's state law tort claims
against the SCSO officers in their official capacities (Claims
V–VII) are barred by governmental immunity. (See id. at 13–21.)
Captain Dalton argues that all three claims asserted against him

---

[3] All citations in this Memorandum Opinion and Order to
documents filed within the court refer to the page numbers
located at the bottom right-hand corner of the documents as they
appear on CM/ECF.

in his individual capacity (Claims II, VI, and VII) should be dismissed pursuant to Rule 12(b)(6). (See Def. Dalton's Br. (Doc. 21) at 7–15, 17–20.)

## III. **ANALYSIS**

### A. **Sheriff Lemons' and Captain Dalton's Arguments for Dismissal of Claims Under Rule 12(b)(6)**

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face if the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable" and demonstrates "more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556–57).

When ruling on a motion to dismiss, this court accepts the complaint's factual allegations as true. See id. Further, this court liberally construes the complaint and "draw[s] all reasonable inferences in favor of the plaintiff." Ray, 948 F.3d at 226. This court does not, however, accept legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

- 14 -

Plaintiff alleges that Sheriff Lemons, in his official capacity, "implemented, maintained, and enforced the customs, practices, policies, or procedures that directed, encouraged, or permitted Defendants Mabe, Smith, and Wolfe to conduct unlawful searches and use excessive force against individuals." (Compl. (Doc. 1) ¶ 147.) A claim against Sheriff Lemons in his official capacity constitutes a claim against the Stokes County Sheriff's Office ("SCSO"). See Kentucky v. Graham, 473 U.S. 159, 165–66 (1985); see also Butterfield v. Gray, 279 N.C. App. 549, 554 n.4, 866 S.E.2d 296, 301 n.4 (2021) (citations omitted) (explaining that, under the North Carolina Constitution, a sheriff's office is a local governmental entity distinct from the county government).

Under Monell v. New York City Department of Social Services, 436 U.S. 658 (1978), a local governmental entity, such as the SCSO, is "liable for its own illegal acts." See Owens, 767 F.3d at 402. Specifically, the local entity is "liable under § 1983 if it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." Id.

To state a § 1983 Monell claim against the SCSO, Plaintiff must "plausibly allege a constitutional harm that stems from the

acts of an [SCSO] employee taken in furtherance of some [SCSO] policy or custom." See Washington v. Balt. Police Dep't, 457 F. Supp. 3d 520, 532 (D. Md. 2020) (quoting Milligan v. City of Newport News, 743 F.2d 227, 229 (4th Cir. 1984) (internal quotation marks omitted)). Sheriff Lemons does not contest that Plaintiff has plausibly alleged a constitutional harm stemming from acts committed by the SCSO officers on March 4, 2021. (See generally Def. Lemons' Br. (Doc. 18).) However, Sheriff Lemons argues that Plaintiff has not pleaded facts sufficient to attribute these constitutional violations to a "policy or custom" of the SCSO. (Id. at 6–12.)

"A policy or custom for which [the SCSO] may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (citation omitted); see also Starbuck v. Williamsburg James City Cnty. Sch. Bd., 28 F.4th 529, 533 (4th Cir. 2022). Regarding the fourth theory of liability, an entity's failure "to put a stop

to or correct a widespread pattern of unconstitutional conduct"
can constitute a "custom by condonation." See Owens, 767 F.3d at
402 (quoting Spell v. McDaniel, 824 F.2d 1380, 1390 (4th Cir.
1987)) (internal quotation marks omitted).

Plaintiff has not plausibly alleged Monell liability under
any of the first three theories articulated in Lytle. As to the
first and second theories, Plaintiff has not pleaded facts
related to an express policy or to the decisions of a
policymaker. As to the third theory, Plaintiff alleges that the
"SCSO does not provide deputies with training on . . . use of
force," (see Compl. (Doc. 1) ¶ 148), but as discussed supra
Section I.B., he has not plausibly alleged a duty or
responsibility on the part of Sheriff Lemons to train his
officers in light of North Carolina's statutory scheme, nor has
he plausibly alleged "an affirmative causal link" between
Lemons' alleged training omissions and Plaintiff's injuries in
light of that scheme. See Washington, 457 F. Supp. 3d at 532.

However, Plaintiff contends that his complaint establishes
a plausible Monell claim under the fourth theory of liability:
custom by condonation. (See Pl.'s Resp. to Def. Lemons' Mot.
(Doc. 29) at 7-9 ("Plaintiff alleges that prior complaints of
excessive force against these deputies were ignored . . . .").)

## 1. SCSO "Custom By Condonation"

"Under this theory of liability, [a sheriff's office] violates § 1983 if [the sheriff] fail[s] to put a stop to or correct a widespread pattern of unconstitutional conduct." See Owens, 767 F.3d at 402 (internal quotation marks and citation omitted). To prevail on this theory, a "plaintiff must point to a persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." Id. (cleaned up). "Both knowledge and indifference can be inferred from the 'extent' of employees' misconduct. Sporadic or isolated violations of rights will not give rise to Monell liability; only 'widespread or flagrant' violations will." Id. at 402-03 (internal citations omitted).

Given the above standard, "prevailing on the merits of a Monell claim is difficult." Id. at 403. However, "simply alleging such a claim is, by definition, easier." Id. In Owens, the Fourth Circuit held that a plaintiff had plausibly alleged a Monell claim against a state's attorney's office when he alleged: (1) "[r]eported and unreported cases from the period of time before and during the events complained of" show that the office had a practice of "knowingly and repeatedly suppressing

- 18 -

exculpatory evidence in criminal prosecutions"; and (2) "a number of motions were filed and granted during this time period," which demonstrates that the office "condon[ed] [this behavior], and/or knowingly turn[ed] a blind eye to it." Id. (citation and internal quotation marks omitted). The court reasoned that "[t]he assertions as to 'reported and unreported cases' and numerous 'successful motions' are factual allegations, the veracity of which could plausibly support a Monell claim." Id. These "brief, but non-conclusory" factual allegations, "if true, would buttress [the plaintiff's] legal conclusion." Id.

Similarly, here, Plaintiff has alleged that (1) "the [SCSO] had complaints about Defendants Mabe, Smith and Wolfe for excessive force" and was aware that the officers "would feed off one another when they worked together," (Compl. (Doc. 1) ¶ 110), and yet, the SCSO (2) "failed to supervise and . . . discipline [these] deputies" and allowed them to work together on the evening of March 4, 2021, thereby "impl[ying] tacit authorization for such behaviors and creat[ing] a widespread custom and practice," (id. ¶ 149; see also id. ¶ 139). As was the case in Owens, Plaintiff will be required to prove the veracity of these allegations and show, among other things, that "the duration and frequency of [the SCSO officers'] conduct was

- 19 -

widespread and recurrent." See Owens, 767 F.3d at 403. But to survive Defendant Lemons' Rule 12(b)(6) motion, Plaintiff's "recitation of facts need not be particularly detailed, and the chance of success need not be particularly high." Id. Plaintiff has therefore stated a plausible Monell claim against the SCSO under a "custom by condonation" theory of liability. See id. at 402-03.

Defendant Lemons' motion to dismiss will be denied as to the Monell claim against him in his official capacity (Claim III).

### ii. Plaintiff has stated a plausible § 1983 supervisory liability claim against Defendant Dalton in his individual capacity (Claim II)

Plaintiff contends that the alleged constitutional violations committed by Defendants Mabe, Smith, and Wolfe on March 4, 2021, are also imputable to the officers' supervisor, Captain Dalton. (See Compl. (Doc. 1) ¶¶ 138-39.) Captain Dalton, like Sheriff Lemons, does not contest that Plaintiff's complaint states a plausible § 1983 claim against Defendants Mabe, Smith, and Wolfe in their individual capacities. (See generally Def. Dalton's Br. (Doc. 21).) Captain Dalton argues that Plaintiff has not plausibly alleged that the alleged constitutional violations by Defendants Mabe, Smith, and Wolfe are imputable to him. (See id. at 7-15.)

"[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) Specifically, a supervisor is liable when "(1) he knew that his subordinate 'was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury'; (2) his response showed 'deliberate indifference to or tacit authorization of the alleged offensive practices'; and (3) that there was an 'affirmative causal link' between his inaction and the constitutional injury." King v. Rubenstein, 825 F.3d 206, 224 (4th Cir. 2016) (quoting Shaw, 13 F.3d at 799). A subordinate poses a "'pervasive' and 'unreasonable' risk of harm" when his "conduct is widespread, or at least has been used on several different occasions and . . . poses an unreasonable risk of harm of constitutional injury." Shaw, 13 F.3d at 799. A supervisor's response demonstrates "deliberate indifference" when it involves "continued inaction in the face of documented widespread abuses." Id. (citation omitted).

Plaintiff alleges that after the events of March 4, 2021, he visited the Stokes County Sherrif's Office to "fil[e] a complaint" with Captain Dalton - "the supervisor of Defendants Mabe, Smith, and Wolfe." (See Compl. (Doc. 1) ¶¶ 104-06, 136.) During their conversation, Captain Dalton "informed [Plaintiff]

- 21 -

that the Sheriff's Office had complaints about Defendants Mabe, Smith and Wolfe for excessive force and that the offices [sic] would feed off one another when they worked together." (Id. ¶ 110.) Citing these remarks by Captain Dalton, Plaintiff alleges that Dalton "possessed actual and/or constructive knowledge that Defendants Mabe, Smith, and Wolfe were the subjects of prior use of force/excessive force complaints and posed a harm to citizens." (Id. ¶ 138.) Plaintiff further alleges that Captain Dalton "consciously and intentionally failed to act or intervene to prevent them from working together on March 4, 2021," and "was deliberately indifferent to his responsibility to train and supervise these Defendants." (Id. ¶ 139.) Finally, Plaintiff alleges that Captain Dalton's "failures" were "a direct and proximate" cause of Plaintiff's constitutional injuries. (See id. ¶¶ 142-143.)

While this court need not accept Plaintiff's legal conclusions as true, it nonetheless finds that he has pleaded facts sufficient to state a plausible § 1983 supervisory liability claim for relief. Drawing all reasonable inferences in Plaintiff's favor, see Ray, 948 F.3d at 226, he has plausibly alleged that Defendant Dalton knew of the risk of harm posed by Defendants Mabe, Smith, and Wolfe (especially when they worked together), as evidenced by the prior complaints about the

officers and Dalton's admission that the officers would "feed off" one another. (See Compl. (Doc. 1) ¶ 110.) These allegations support the first supervisory liability element. See King, 825 F.3d at 224. He has also alleged that Captain Dalton failed to correct the officers' behavior or otherwise intervene to prevent them from working together, (see id. ¶ 139), which plausibly supports the second element. Regarding the third element, it is reasonable to infer from the facts alleged that Defendant Dalton's supervisory omissions allowed his subordinates' conduct to continue unabated, ultimately causing Plaintiff's constitutional injuries on the evening of March 4, 2021.

Defendant Dalton's motion to dismiss will be denied as to the § 1983 supervisory liability claim (Claim II) brought against him in his individual capacity.[4]

_____

[4] Defendant Dalton also states that he is entitled to qualified immunity as to this § 1983 supervisory liability claim on account of his not having violated any "clearly established" constitutional right but he does not flesh out this argument. (See Def. Dalton's Br. (Doc. 21) at 15.) Supervisory liability is a well-established means of attaching § 1983 liability, see generally King, 825 F.3d 206, and based on the facts Plaintiff has alleged, it is plausible that Dalton fell short of the standard for supervision placed on him by Fourth Circuit precedent, see id. at 224. Further factual development is needed to determine whether Defendant Dalton is entitled to qualified immunity on this claim. Thus, it is premature to award qualified immunity at this stage.

### iii. <u>**Plaintiff's claim for gross negligence against Defendant Dalton in his individual capacity is barred by public official immunity (Claim VI)**</u>

The factual allegations underlying Plaintiff's gross negligence claim against Captain Dalton overlap significantly with those underlying his § 1983 supervisory liability claim. (<u>See</u> Compl. (Doc. 1) ¶ 171.)

"[A] claim for gross negligence requires that plaintiff plead facts on each of the elements of negligence, including duty, causation, proximate cause, and damages." <u>Land v. Whitley</u>, 292 N.C. App. 244, 255, 898 S.E.2d 17, 26, <u>review allowed</u>, 900 S.E.2d 662 (2024) (citation omitted). Negligence becomes "gross negligence" when it involves "wanton conduct done with conscious or reckless disregard for the rights and safety of others." <u>Id.</u> at 255, 898 S.E.2d at 26 (citation omitted). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." <u>Cullen v. Logan Devs., Inc.</u>, 386 N.C. 373, 382, 904 S.E.2d 730, 737 (2024) (citation omitted).

Defendant Dalton argues that Plaintiff has not plausibly alleged any "grossly negligent" conduct by Captain Dalton, and that even if he has, Captain Dalton is protected by public official immunity. (<u>See</u> Def. Dalton's Br. (Doc. 21) at 17.)

- 24 -

> Public official immunity is a derivative form of governmental immunity, which precludes suits against public officials in their individual capacities as follows: As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability.

Wilcox v. City of Asheville, 222 N.C. App. 285, 288, 730 S.E.2d 226, 230 (2012) (cleaned up) (citations omitted). "Thus, a public official is immune from suit unless the challenged action was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt." Id.; accord Bartley v. City of High Point, 381 N.C. 287, 294, 873 S.E.2d 525, 533 (2022). "Sheriffs, sheriff's deputies, and jailers have all been recognized as public officials . . . ." Butterfield, 279 N.C. App. at 554, 866 S.E.2d at 301.

Plaintiff alleges that "the actions of each Defendant" named in this suit "constitute . . . malicious . . . and improper police conduct." (Compl. (Doc. 1) ¶ 19.) "[A] malicious act is one which is (1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." Bartley, 381 N.C. at 296, 873 S.E.2d at 534 (internal quotation marks and citation omitted). Regardless of the sufficiency of Plaintiff's pleadings as to the first two elements of malice, Plaintiff has not plausibly alleged that Defendant Dalton's actions were taken with the "inten[t] to be injurious" to

- 25 -

Plaintiff, and thus he has not supported his conclusory allegation that Dalton engaged in malicious police conduct. See id.; see also Twombly, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." (cleaned up)); Meyer v. Walls, 347 N.C. 97, 114, 489 S.E.2d 880, 890 (1997) ("[W]e note that a conclusory allegation that a public official acted willfully or wantonly should not be sufficient, by itself, to withstand a Rule 12(b)(6) motion to dismiss. The facts alleged in the complaint must support such a conclusion.").

For one, Plaintiff does not allege that Captain Dalton's discretionary decisions about how to supervise Officers Mabe, Smith, and Wolfe were made with any <u>actual</u> intent to injure Plaintiff. (<u>See</u> <u>generally</u> Compl. (Doc. 1).) Granted, in the context of public official immunity, the Supreme Court of North Carolina instructs:

> We have held that "the intention to inflict injury may be <u>constructive</u>" intent where an individual's conduct "is so reckless or so manifestly indifferent to the consequences, where the safety of life or limb is involved, as to justify a finding of willfulness and wantonness equivalent in spirit to an actual intent."

<u>Bartley</u>, 381 N.C. at 296, 873 S.E.2d at 534 (emphasis added) (internal citations omitted). Although this court found that Plaintiff plausibly alleged Captain Dalton, through supervisory omissions, was deliberately indifferent to the general risk of

harm that Officers Mabe, Smith, and Wolfe posed to the citizens of Stokes County, (see supra Section III.A.ii.), the same allegations do not plausibly support a conclusion that Dalton was "so reckless or so manifestly indifferent to the consequences," that he possessed a "spirit" that was "equivalent . . . to an actual intent" to injure Plaintiff. See Bartley, 381 N.C. at 296, 873 S.E.2d at 534.

Because Plaintiff has not plausibly alleged that Captain Dalton acted with malice, nor that he acted "outside the scope of official authority" or "corrupt[ly]," see Wilcox, 222 N.C. App. at 288, 730 S.E.2d at 230, his claim for gross negligence is barred by public official immunity.[5] Cf. Mitchell v. Pruden, 251 N.C. App. 554, 561–62, 796 S.E.2d 77, 83 (2017) (granting public official immunity and dismissing claim at 12(b)(6) stage for failing to plausibly allege defendant's malice); Petrillo v.

---

[5] Defendant Dalton appears to argue that public official immunity categorically bars claims of gross negligence. (See Def. Dalton's Br. (Doc. 21) at 17.) He cites to a Fourth Circuit opinion, published in 1994, which states: "[T]he North Carolina Supreme Court has never allowed a showing of gross negligence to suffice to pierce an officer's immunity, absent a statute specifically abolishing the common law immunity." Shaw, 13 F.3d at 803. It is not certain how the Fourth Circuit might resolve that issue today in light of recent North Carolina cases. See, e.g., Wilcox, 222 N.C. App. at 301, 730 S.E.2d at 238 ("[S]o long as [plaintiff] can also satisfy [his] burden of showing that the Individual Defendants acted maliciously, [plaintiff] can assert claims against the Individual Defendants in their individual capacities for negligen[ce]."). Nonetheless, that issue need not be resolved here.

- 27 -

Barnes-Jones, 291 N.C. App. 62, 68, 894 S.E.2d 772, 778 (2023) (same).

For these reasons, Defendant Dalton's motion to dismiss the gross negligence claim brought against him in his individual capacity (Claim VI) will be granted.

### iv. **Plaintiff has not stated a plausible IIED claim against Defendant Dalton in his individual capacity (Claim VII)**

To state an IIED claim under North Carolina law, a plaintiff must allege: "(1) extreme and outrageous conduct [by the defendant], (2) which is intended to cause and does cause (3) severe emotional distress to another." Turner v. Thomas, 369 N.C. 419, 427, 794 S.E.2d 439, 446 (2016) (alteration in original) (citation omitted). "The tort also may be established when a 'defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress.'" Id. "Conduct constituting this cause of action may be found in an abuse by the actor of a position which gives him power to affect the interests of another," when that conduct "exceeds all bounds of decency tolerated by society" and is "regarded as atrocious, and utterly intolerable in a civilized community." Id. (cleaned up) (citations omitted).

Following the events of March 4, 2021, Plaintiff sought to file a "complaint" with the Stokes County Sheriff's Office

against Officers Mabe, Smith, and Wolfe. (Compl. (Doc. 1) ¶¶ 104-06, 111.) When Plaintiff arrived at the Sheriff's Office, Captain Dalton "assured [Plaintiff] that the matter would be handled and heard [Plaintiff] and his family's complaints." (Id. ¶ 111.) However, "Defendant Dalton did not provide [Plaintiff] with any forms, paperwork, of [sic] file number concerning his complaint." (Id.)

Plaintiff's IIED claim is founded upon the allegations, "upon information and belief," that Dalton "did [sic] open any file or investigation of this matter despite receiving the verbal complaints," "lied" to Plaintiff to "discourage" him from filing a complaint, "ignor[ed] [Plaintiff's] complaints of excessive force," "destroy[ed] video evidence of [Plaintiff's] encounter[] with officers," and "took active steps to conceal [Plaintiff's] report of excessive force." (See Compl. (Doc. 1) ¶¶ 176, 111-12; see also Pl.'s Ex. 2, Pl.'s Decl. (Doc. 1-2) ¶¶ 18-19.)[6] In his response memorandum, Plaintiff argues that these

_____

[6] Plaintiff also incorporates his allegations about Captain Dalton's supervision of Defendants Mabe, Smith, and Wolfe into the IIED subsection of his complaint. (See Compl. (Doc. 1) ¶¶ 174, 176(i).) However, those alleged supervisory failures by Captain Dalton are not plausibly linked to any intent on behalf of Dalton to cause emotional harm to Plaintiff. This court focuses its analysis of Plaintiff's IIED claim on the actions he alleges Dalton took, directed at Plaintiff, after the events of March 4, 2021.

allegations show that Captain Dalton "participated in a cover-up." (Pl.'s Resp. to Def. Dalton's Mot. (Doc. 33) at 14.)

Plaintiff's allegations that Captain Dalton "lied," "discouraged," "ignored," and "destroyed" evidence are conclusions not plausibly supported by the facts alleged.[7] Plaintiff alleges as well-pleaded fact that Captain Dalton (1) "heard [Plaintiff's] and his family's complaints," (2) "assured [Plaintiff] that the matter would be handled," and (3) "did not provide [Plaintiff] with any forms, paperwork, of [sic] file number concerning his complaint." (Compl. (Doc. 1) ¶ 111.) However, Plaintiff does not allege that the SCSO typically adheres to a formal, written process for responding to citizen complaints lodged against their deputies, nor that Plaintiff had

_____

[7] "Generally, conclusory allegations based solely 'upon information and belief' are 'insufficient to defeat a motion to dismiss.'" Mystic Retreat Med Spa & Weight Loss Ctr. v. Ascentium Cap. LLC, 615 F. Supp. 3d 379, 384 (M.D.N.C. 2022) (citation omitted). The words "upon information and belief" "will only make otherwise unsupported claims plausible when the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." Id. at 385 (quoting Citizens United v. Schneiderman, 882 F.3d 374, 384–85 (2d Cir. 2018)). Here, even if some of the facts are within the control of the Sheriff, Plaintiff does not allege any facts which support his belief that a cover up occurred. Assuming Plaintiff's allegations can be construed to support an inference that no internal, disciplinary action was taken against the officers, that absence of disciplinary action does not plausibly support an inference of any intent by Dalton to inflict emotional distress upon Plaintiff.

a right to any follow up communication or other recourse after lodging a verbal complaint. At bottom, this court is unable to infer from the facts alleged that Defendant Dalton failed to "handle[]" the matter, as he allegedly assured Plaintiff he would, (id.), nor infer that he participated in the more sinister conduct of "a cover-up," (Pl.'s Resp. to Def. Dalton's Mot. (Doc. 33) at 14), the latter of which might give rise to an IIED claim if plausibly supported by the facts alleged.

Defendant Dalton's motion to dismiss will be granted as to Plaintiff's IIED claim (Claim VII) brought against him in his individual capacity. However, in acknowledgement that the internal actions Defendant Dalton took after receiving Plaintiff's verbal complaint are facts largely "within the possession and control of the defendant," see Mystic Retreat Med Spa & Weight Loss Ctr., 615 F. Supp. 3d at 385, Plaintiff's claim will be dismissed without prejudice.

B. **Sheriff Lemons' Argument for Governmental Immunity**

Plaintiff's complaint asserts the following state law claims against various officers of the SCSO in both their individual and official capacities: assault and battery (Claim V), (Compl. (Doc. 1) ¶¶ 160–68); gross negligence (Claim VI), (id. ¶¶ 169–73), and intentional infliction of emotional distress ("IIED") (Claim VII), (id. ¶¶ 174–78).

- 31 -

As opposed to an individual capacity suit where the plaintiff "seeks recovery from the defendant directly[,] a suit against a defendant in his official capacity means that the plaintiff seeks recovery from the entity of which the public servant defendant is an agent." Meyer, 347 N.C. at 110, 489 S.E.2d at 887 (citation omitted). Under North Carolina law, "official-capacity suits are merely another way of pleading an action against the governmental entity." Mullis v. Sechrest, 347 N.C. 548, 554, 495 S.E.2d 721, 725 (1998). Sheriff Lemons argues that Plaintiff's state law claims, insofar as they are brought against SCSO officers in their official capacities, are barred by governmental immunity. (See Def. Lemons' Br. (Doc. 18) at 13.)

A public official sued in his official capacity – including a sheriff or sheriff's deputy - "may raise the defense of governmental immunity." See Butterfield, 279 N.C. App. at 554, 866 S.E.2d at 301. "Under the doctrine of governmental immunity, . . . public officials are immune from suits alleging negligence[8] in the exercise of a governmental function, unless the plaintiff shows that the . . . public officials waived immunity." Id. A

---

[8] "A county is also generally immune from suit for intentional torts of its employees in the exercise of governmental functions." See Butterfield, 279 N.C. App. at 554, 866 S.E.2d at 301 (citation omitted).

county's "purchase of liability insurance pursuant to N.C. Gen. Stat. § 153A-435 may waive governmental immunity for both a county and a sheriff," except to the extent "the applicable liability insurance policy excludes a plaintiff's claim from coverage." Id. at 556, 866 S.E.2d at 302. Additionally, a sheriff's purchase of a surety bond, as required by N.C. Gen. Stat. § 162-8, waives governmental immunity, but only "to the extent of the coverage provided." See id. at 559-60, 866 S.E.2d at 304 (citations omitted).

Here, Defendant Sheriff Lemons has produced a copy of Stokes County's liability insurance policy for the 2020-2021 fiscal year. (See Def. Lemons' Ex. 1, Insurance Policy (Doc. 18-1).)[9] The policy includes the same express language, (see id. at 82, 84), that North Carolina courts have repeatedly held does not waive governmental immunity. See, e.g., Est. of Earley ex rel. Earley v. Haywood Cnty. Dep't of Soc. Servs., 204 N.C. App. 338, 342-43, 694 S.E.2d 405, 409 (2010); Butterfield, 279 N.C. App. at 556-57, 866 S.E.2d at 302-03. Plaintiff does not challenge this point. (See Pl.'s Resp. to Def. Lemons' Mot.

---

[9] Defendant's liability insurance policy is "integral to the complaint and there is no dispute about the document's authenticity" - thus, this court can consider the policy in deciding Defendant's motion to dismiss. See Doriety for Est. of Crenshaw v. Sletten, 109 F.4th 670, 679 (4th Cir. 2024) (quoting Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016)).

(Doc. 29) at 12-13.) In accordance with the precedent established by North Carolina state courts, this court finds that Stokes County's purchase of liability insurance did not waive the SCSO's governmental immunity.

"Though [this court] conclude[s] that Defendants did not waive immunity by purchasing liability insurance, [it] must also consider whether Sheriff [Lemons] waived immunity by purchasing a sheriff's bond." See Butterfield, 279 N.C. App. at 559, 866 S.E.2d at 304. As stated above, purchase of a sheriff's bond "waives the sheriff's governmental immunity, but only to the extent of the coverage provided." Id. at 559, 866 S.E.2d at 304 (citations and internal quotation marks omitted).[10] The North Carolina legislature prescribes an avenue for citizens to recover on these bonds: "Every person injured by the neglect, misconduct, or misbehavior in office of any . . . sheriff . . . may institute a suit or suits against said officer or any of them and their sureties upon their respective bonds for the due performance of their duties in office . . . ." See N.C. Gen. Stat. § 58-76-5.

_____

[10] This waiver also "extends to the acts of a sheriff's deputy, for '[t]he acts of the deputy are acts of the sheriff.'" Knibbs v. Momphard, 30 F.4th 200, 230 (4th Cir. 2022) (quoting Styers v. Forsyth County, 212 N.C. 558, 194 S.E. 305, 308 (1937)).

In the present case, "Sheriff Lemons concedes that [SCSO's] purchase of the sheriff's official bond waives governmental immunity, but . . . only for the $25,000 face amount of the bond." (Def. Lemons' Reply (Doc. 37) at 6 (cleaned up); see also Def. Lemons' Ex. A, Surety Bond (Doc. 37-1).) This court agrees that the SCSO's bond waives governmental immunity, and that it does so only to the extent of its face value. See Butterfield, 279 N.C. App. at 560-61, 866 S.E.2d at 304-05; White v. Cochran, 229 N.C. App. 183, 190, 748 S.E.2d 334, 339 (2013); Pickens v. Hendricks, No. 1:21-cv-30, 2024 WL 4181050, at *10 (W.D.N.C. Sept. 12, 2024) (slip copy).

Defendant Lemons also argues that this waiver of governmental immunity applies "only as to Plaintiff's statutory claim under N.C. Gen. Stat. § 58-76-5," that is, Plaintiff's claim for relief asserted against Defendant Western Surety (Claim VIII). (See Def. Lemons' Reply (Doc. 37) at 6; see also Compl. (Doc. 1) ¶¶ 179-87.) Lemons argues that governmental immunity has not been waived for the state law tort claims (Claims V, VI, and VII), and that these claims should be dismissed insofar as they are asserted against SCSO officers in their official capacities. (See Def. Lemons' Br. (Doc. 18) at 21, see also id. at 21 n.3.)

The procedure "to recover on a sheriff's bond" is well established under North Carolina precedent: "[A] plaintiff must join the bond surety as a party to any action against the sheriff." Efird v. Riley, 342 F. Supp. 2d 413, 425 (M.D.N.C. 2004) (citation omitted); see also Summey v. Barker, 142 N.C. App. 688, 691, 544 S.E.2d 262, 265 (2001). However, in the present case, where Plaintiff has joined the bond surety (Western Surety Company) as a party to the litigation, has asserted a standalone claim against the surety (Claim VIII), and has asserted official capacity state law claims against officers of the SCSO (Claims V, VI, and VII), it is not immediately clear whether Plaintiff's claim against the surety, Plaintiff's claims against the officers in their official capacities, or both, should represent his right to recover against the bond should he prevail on the merits of those claims.

Defendant Lemons cites to authorities which emphasize that a statutory claim against a bond is a distinct cause of action from common law tort claims brought against officers in their official capacities. See Stafford v. Barker, 129 N.C. App. 576, 584–85, 502 S.E.2d 1, 6 (1998); Hull v. Oldham, 104 N.C. App. 29, 40, 407 S.E.2d 611, 617 (1991). Lemons argues that his purchase of a surety bond waives immunity only for the statutory claim. (See Def. Lemons' Reply (Doc. 37) at 6–8; Def. Lemons'

Br. (Doc. 18) at 21 n.3.) However, this court notes examples where state courts appear to permit a plaintiff to rely on official capacity claims as the vehicle for securing relief against a surety bond. See, e.g., Summey, 142 N.C. App. at 690–691, 544 S.E.2d at 265 (denying a defendant's motion to dismiss plaintiff's negligence claim and citing N.C. Gen. Stat. § 58-76-5 for the proposition that "public officers may be sued in their official capacities"); Smith v. Jackson Cnty. Bd. of Educ, 168 N.C. App. 452, 468–69, 608 S.E.2d 399, 411–12 (2005) (affirming denial of a motion to dismiss plaintiff's negligent supervision and retention claim and permitting plaintiff to amend complaint to add surety as defendant).[11]

Given this ambiguity, this court chooses to defer determination – pursuant to Federal Rule of Civil Procedure 12(i) – of whether Plaintiff's eighth claim for relief asserted against Western Surety, or his fifth, sixth, and seventh claims for relief asserted against officers of the SCSO in their official capacities, or both categories of claims, ought to represent Plaintiff's right to recover against the bond should

---

[11] The North Carolina Supreme Court has examined the operative statute, N.C. Gen. Stat. § 58-76-5, in its current form only once, in Wynn v. Frederick, 385 N.C. 576, 580, 895 S.E.2d 371, 376 (2023). In Wynn, however, the issue before the court was whether the statute waives immunity for state magistrates. Id. at 580–81, 895 S.E.2d at 376.

he succeed on the merits. See Fed. R. Civ. P. 12(i) ("[A]ny defense listed in Rule 12(b)(1)-(7) . . . must be heard and decided before trial unless the court orders a deferral until trial.").

At this stage, it is enough for this court to reaffirm well established principles: "To the extent that the Plaintiff may recover damages against [the SCSO pursuant to state law claims] his recovery will be limited to the amount of the bond [($25,000)]." See Pickens, 2024 WL 4181050, at *10; see also White, 229 N.C. App. at 190, 748 S.E.2d at 339 ("[T]he purchase of a bond precludes a sheriff from relying upon the protective embrace of governmental immunity . . . only where the surety is joined as a party to the action . . . and only to the extent of the amount of the bond." (internal quotation marks and citations omitted)); Butterfield, 279 N.C. App. at 561, 866 S.E.2d at 305 (holding that "governmental immunity bars Plaintiffs' claims in excess of Sheriff['s] statutory bond").

Defendant Lemons' motion seeking dismissal of the official capacity tort claims brought against officers of the SCSO (Claims V, VI, and VII) will be denied.

**C.** <u>**Plaintiff May Not Assert a Direct Cause of Action Under the North Carolina Constitution**</u>

In his complaint, Plaintiff asserts

> [i]n the alternative, if it is determined that
> Defendants [sic] Sheriff Lemons has not waived sovereign
> or governmental immunity or that any such waiver does
> not allow Plaintiff an adequate remedy at state law,
> then Plaintiff asserts a direct cause of action for
> violations of Plaintiff's rights under the North
> Carolina Constitution.

(Compl. (Doc. 1) ¶ 45; <u>see also</u> Pl.'s Resp. to Def. Lemons' Mot. (Doc. 29) at 15–17; Def. Lemons' Reply (Doc. 37) at 8–12.)

This court found that Defendant Lemons <u>has</u> waived governmental immunity via the purchase of a sheriff's bond, at least to the extent of the face value of the bond. Nonetheless, it will briefly discuss below whether Plaintiff possesses "an adequate remedy at state law," and conclude that he does.

In <u>Corum v. University of North Carolina Through Board of Governors</u>, 330 N.C. 761, 413 S.E.2d 276 (1992), the Supreme Court of North Carolina instructed: "[I]n the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution." 330 N.C. 761, 782, 413 S.E.2d, 276, 289 (1992). The court emphasized that the North Carolina constitution allows for a direct claim only where "no other remedy" exists. <u>Id.</u> at 783, 413 S.E.2d at 290. More recently, the North Carolina Court of Appeals analyzed the North Carolina

- 39 -

Supreme Court's precedent and explained that a Plaintiff has an "adequate remedy" where: (1) "the remedy addresses the alleged constitutional injury," and (2) "the remedy provides the plaintiff an opportunity to enter the courthouse doors." <u>Taylor v. Wake Cnty.</u>, 258 N.C. App. 178, 185, 811 S.E.2d 648, 654 (2018) (citations and internal quotation marks omitted).

Here, because Plaintiff has a remedy against the SCSO's surety <u>and</u> against the SCSO officers in their individual capacities, Plaintiff has an "adequate remedy" available to him that both (1) addresses his alleged constitutional injury and (2) allows him to "enter the courthouse doors." <u>See</u> <u>id.</u> Accordingly, Plaintiff may not assert a direct cause of action under the North Carolina Constitution.

## IV.  <u>CONCLUSION</u>

Regarding Plaintiff's four claims brought under 42 U.S.C. § 1983, this court has construed Plaintiff's complaint to assert a § 1983 <u>Monell</u> claim against the Sheriff of Stokes County (Claim III), as well as individual capacity § 1983 claims against Defendant Dalton for supervisory liability (Claim II), against Defendants Mabe, Wolfe, and Smith for an unreasonable search and seizure (Claim I), and against Defendant Wolfe for failure to intervene (Claim IV). Defendants Lemons and Dalton moved to dismiss Claim III and Claim II, respectively, pursuant to Rule

12(b)(6). This court found that Plaintiff stated a plausible
Monell claim against Sheriff Lemons under a "condonation" theory
of liability, as well as a plausible § 1983 supervisory liability
claim against Dalton. The individual Defendants named in Claims I
and IV did not seek dismissal of those claims at this stage.
Thus, all four of Plaintiff's § 1983 claims will proceed to
discovery.

Plaintiff's complaint additionally asserts state law claims
for assault and battery (Claim V), gross negligence (Claim VI),
and IIED (Claim VII), against officers of the SCSO in both their
individual and official capacities. Defendant Dalton, a named
defendant in Claim VI and Claim VII, moved to dismiss the claims
insofar as they are asserted against him in his individual
capacity. This court found that Claim VI is barred against
Defendant Dalton by public official immunity and Claim VII fails
on 12(b)(6) grounds. Both claims will be dismissed against
Defendant Dalton, although the dismissal of Claim VII will be
without prejudice. The other individual Defendants did not seek
dismissal of the state law claims brought against them in their
individual capacities. Thus, Claim V will proceed against all the
named Defendants in their individual capacities, and Claims VI
and VII will proceed against all the named Defendants in their
individual capacities except for Defendant Dalton.

- 41 -

Finally, Defendant Lemons moved to dismiss the state law claims insofar as they were brought against the named Defendants in their official capacities, arguing that these claims are barred by governmental immunity. This court found that the Stokes County Sheriff's Office has waived governmental immunity up to the amount of the face value of the bond and has deferred ruling, pursuant to Federal Rule of Civil Procedure 12(i), as to whether that waiver applies to Plaintiff's official capacity tort claims (Claims V, VI, and VII) in addition to Plaintiff's statutory cause of action asserted against Western Surety (Claim VIII).

**IT IS THEREFORE ORDERED** that Defendant Joey Lemons' Motion to Dismiss, (Doc. 17), is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Terry Dalton's Motion to Dismiss, (Doc. 20), is **GRANTED IN PART** and **DENIED IN PART.** It is **DENIED** as to the claim for § 1983 supervisory liability. It is **GRANTED** as to the claim for gross negligence, and this claim is **DISMISSED** against Defendant Dalton. It is also **GRANTED** as to the claim for IIED, and this claim is **DISMISSED WITHOUT PREJUDICE** against Defendant Dalton.

This the 5th day of May, 2025.

_____
United States District Judge